IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JOSEPH CLAYTON MCELWAINE, ) | CIVIL ACTION NO. 9:16-1444-JMC-BM |
| Plaintiff, ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN, ) Acting Commissioner of Social Security, ) | |
| Defendant. ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Supplemental Security Income ("SSI") on September 20, 2012 (protective filing date) alleging disability beginning July 9, 1981[1] due to mental retardation, high blood pressure, and right hip pain. (R.pp. 29, 65, 187). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 17, 2014. (R.pp. 45-64). The ALJ denied Plaintiff's claim in a decision issued July 25, 2014. (R.pp. 29-39). The Appeals Council thereafter granted Plaintiff's

---

[1] Although Plaintiff alleges an onset date of disability in 1981, the relevant period for his SSI claim begins with his application date, through the date of the ALJ's decision. See 20 C.F.R. § 416.202(g) [a claimant is not eligible for SSI until, among other factors, the filing of an application for SSI benefits]; 20 C.F.R. § 416.501 [a claimant may not be paid for SSI for any time period that predates the first month he satisfies the eligibility requirements, which cannot predate the date on which an application is filed].



request for review, and then issued an unfavorable decision of its own, which is the final administrative action of the Commissioner with respect to Plaintiff's application. (R.pp. 3-6).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration of his claim. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## **Scope of review**

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].



The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

**Medical and Education Records**

In October 1986, when Plaintiff was five years old, he was evaluated by Dr. Kathleen R. Helfriech-Miller, a psychologist at Rehabilitation Specialists, because he had failed a speech and language screening at school. Plaintiff's parents noted that his walking had been delayed, and believed that his speech and language milestones were also delayed. Testing revealed that Plaintiff had a mental age of three years with respect to vocabulary and language, and Dr. Helfrich-Miller's impression was that Plaintiff had receptive and expressive language skills at a three-and-a-half year old level. She recommended language therapy and further testing to determine whether this was a pervasive developmental delay or a specific language problem. (R.pp. 223-227).

In 1988, Stanford-Binet Intelligence Scale testing gave Plaintiff a composite score of 74. This placed Plaintiff in the borderline range of mental abilities, and when combined with other scores made him ineligible for special kindergarten class placement. Plaintiff's scores ranged from "a high three year old level in Short-Term Memory to average ability, high six year old level, in the Verbal Reasoning area". However, his low short-term memory score was thought to be due to attention and concentration difficulties rather than any basic problem with memory skills, and removal of this score yielded a partial composite score of 81, indicating low-average intelligence. However, it was noted that Plaintiff exhibited fearful behavior in the classroom, appeared to not know



what was going on, he did not participate much with other children, and performance on Bender and HTP testing indicated possible emotional difficulties, weak organizational skills, and a possible neurological impairment. (R.pp. 352-356).

School records from 1988 reflect that Plaintiff was provided with an Individualized Education Plan. Interview, observation, and teacher input suggested that Plaintiff was functioning within the below average range of general ability, but as he had shown no academic growth during the previous year, it was concluded that Plaintiff met the eligibility requirements for special education. Adapted physical education testing indicated deficits in perceptual motor function, motor development, and motor achievement. (R.pp. 316-330).

On May 29, 1990, a school report indicated that Plaintiff demonstrated below average physical skills, but had adequate fine motor skills. He had also made great improvement in math, but was below average in cognitive/adaptive functioning and had inconsistent motivation and immaturity in terms of social and emotional functioning. (R.p. 446). Plaintiff was further noted to have "significant academic delays in all areas", and it was deemed that he would be best served by a special day class, as he was "unable to profit from [the] regular program." (R.p. 230). In June 1990, Plaintiff's teacher wrote that Plaintiff had been in her Communicatively Handicapped Special Day Class during the 1989-1990 school year, that Plaintiff had made "good academic progress" and she did not believe his language skills were "an area of concern", but that as Plaintiff was performing at a first grade level in both reading and math, placement in a Learning Disabled Special Day Class was required because he was nine-years old. (R.p. 232). Thereafter, Plaintiff was in self-contained classes for 75% of school hours during the 1990-1991 school year. . (R.p. 235).



Achievement testing in January 1993 (when Plaintiff was almost twelve years old) resulted in grade level equivalent results of word recognition 2, oral reading 3, vocabulary comprehension 4, paragraph comprehension 3-2, spelling 2, writing 3, computation 2, and word problems (math) 3. (R.p. 364). In February 1993 it was noted that Plaintiff was in self-contained classes and was classified as educably mentally handicapped. (R.p. 365). In January 1995, school records indicated that Plaintiff continued to demonstrate academic skills below grade level, and it was concluded that the best placement for him was again in self-contained classes. (R.pp. 375-376). Practice GED testing in 1999 indicated that Plaintiff was unable to pass the exam. (R.p. 243).

Upon referral from the state agency, Plaintiff underwent intelligence and academic achievement testing by Dr. Cashton B. Spivey, a psychologist, on November 6, 2009. Plaintiff told Dr. Spivey that he attended self-contained special education classes while he was in school and had received a certificate of completion, rather than a regular diploma. As for activities, Plaintiff reported that he bathed and dressed himself; prepared simple meals; helped with chores such as vacuuming, dusting, and yard work; and enjoyed cartoons, comic books, and drawing. Although he had a drivers's license, Plaintiff said he could not drive because he was unable to find locations successfully without becoming lost. He also reported that he was unable to read a newspaper or perform simple arithmetic, and that his parents managed his finances. (R.pp. 266-267).

Plaintiff's IQ testing (WAIS-IV) scores were: verbal comprehension 89 (low average range), perceptual reasoning 69 (intellectually disabled), working memory 71 (borderline), and processing speed 65 (intellectually disabled). Dr. Spivey opined that Plaintiff "appears to be an individual who operates primarily in the borderline intellectual range", and that "the chances are 95 out of 100 that his true Full Scale IQ falls within the range of 67 to 75." On the WRAT-4, Plaintiff



obtained academic achievement test scores of: word reading - grade equivalent 6.5, spelling - grade equivalent 4.4, and math computation - grade equivalent 4.0. (R.pp. 267-268). Dr. Spivey concluded that Plaintiff appeared "to be an individual of borderline general intelligence with satisfactory visual-motor functioning and academic achievement deficits", and assigned him a Global Assessment of Functioning (GAF) score of 55.[2] Dr. Spivey further opined that Plaintiff might display difficulty managing funds independently and accurately. (R.pp. 268-269).

After falling and hitting his right leg in July 2012, Plaintiff was examined by Dr. William Wimberly of Summerville Family Practice. Plaintiff reported that his pain improved after the original fall, but had returned after increased bike riding. Examination revealed that Plaintiff was tender to palpation in his right trochanter, and Dr. Wimberly assessed trochanteric bursitis in Plaintiff's right hip, administered an injection, and cautioned Plaintiff to rest and avoid pressure. (R.p. 313). On August 30, 2012, Plaintiff reported to Dr. Wimberly that his leg was still painful, but better since the July 2012 injection. Dr. Wimberly injected Plaintiff again, prescribed Mobic, and directed Plaintiff to apply ice and to avoid pressure and aggravation. (R.p. 312).

On March 24, 2014, Dr. Brian Cuddy of Charleston Neurological Associates noted that Plaintiff had a known L5-S1 right-sided disc herniation, with foraminal narrowing at L4-5. He wrote that if injections did not improve Plaintiff's symptoms, he would recommend that Plaintiff

---

[2]"Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF between 51 and 60 indicates the presence of moderate symptoms. Perry v. Apfel, No. 99-4091, 2000 WL 1475852 at *4 (D.Kan. July 18, 2000); Matchie v. Apfel, 92 F.Supp.2d 1208, 1211 (D.Kan. 2000). However, it should be noted that the Manual (DSM-V) has removed the GAF score scale from its current edition, stating that it lacks conceptual clarity and is an unreliable psychometric measurement. See e.g., Finley v Colvin, No. 12-7908, 2013 WL 6384355, at *23 n. 9 (S.D.W.Va. Dec. 5, 2013).



undergo surgical decompression. (R.pp. 447-448). In June 2014, Dr. Cuddy diagnosed Plaintiff with lumbar stenosis and noted that Plaintiff was a candidate for surgery for failure to improve. (R.p. 450).

**Discussion**

Plaintiff was thirty-one years old when his application for SSI was filed, and thirty-three years old at the time of the ALJ's decision. He has a limited education and past relevant work experience as a grocery bagger. (R.pp. 38, 183, 188). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.

After a review of the evidence and testimony in the case, the ALJ determined that Plaintiff suffers from the "severe" impairments of intellectual disability and lumbar degenerative disc disease (R.p. 31). However, the Appeals Council disagreed in part with the ALJ's determination, and instead found that Plaintiff's severe mental impairment is borderline intellectual functioning, not intellectual disability. (R.pp. 4-5). Even so, the Appeals Council agreed with the ALJ's finding that Plaintiff retained the residual functional capacity ("RFC") for sedentary work[3] limited to occasional postural activities, opportunities to stand every hour, and unskilled work. (R.pp. 6, 34). The ALJ also found that Plaintiff was unable to perform any of his past relevant work with these limitations, but after obtaining testimony from a vocational expert ("VE"), concluded that Plaintiff could perform

---

[3]Sedentary work is defined as lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

7



other jobs existing in significant numbers in the national economy with these limitations, and was therefore not disabled during the period at issue. (R.pp. 28, 38-39). The Appeals Council adopted these findings. (R.pp. 4, 6)

Plaintiff asserts that in reaching this decision, the Commissioner erred because the ALJ's Listing analysis[4] (the ALJ found that Plaintiff did not meet or equal a Listing, including Listing 12.05 for intellectual disability) is not supported by substantial evidence. Specifically, Plaintiff argues that he meets Listing12.05C because he has presented evidence of IQ scores in the required range and deficits in adaptive functioning with onset in the developmental period. After careful review of the record and consideration of the arguments presented, the undersigned is constrained to agree with the Plaintiff that the ALJ erred in conducting his Listing analysis, and that this case should therefore be reversed and remanded for further consideration of this issue.

At the time of the ALJ's decision, the Listings at 12.05C required a claimant to show:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\* \* \*

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

---

[4]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). In order to meet a listing, a claimant's impairment must "meet *all* of the specified medical criteria." Id. (emphasis in original).

8



The ALJ found that the requirements of paragraph C[5] were not met "because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[]." (R.p. 32).

However, Plaintiff does have a physical impairment imposing an additional and significant work-related limitation of function, as the ALJ's own RFC determination (adopted by the Appeals Council) is that Plaintiff is limited to a range of sedentary work with postural limitations based on Plaintiff's "severe" physical impairment of degenerative disc disease. (R.p. 37). By definition, an impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987). Additionally, both the ALJ and the Appeals Council also found that Plaintiff's impairments prevented him from performing his past relevant work. (R.pp. 4, 38). See Rainey v. Heckler, 770 F.2d 408, 410-411 (4th Cir. 1985) [If a claimant cannot perform his past relevant work, that fact alone establishes the "existence of an additional and significant work-related limitation of function" required under § 12.05C.].

Therefore, the ALJ's decision appears to rest on a finding that Plaintiff did not have a valid IQ of between 60 and 70. However, although the ALJ appears to have found that Plaintiff did not have a valid verbal, performance, or full scale IQ score of 60 through 70, the evidence of record clearly reflects that Plaintiff had a perceptual reasoning (performance)[6] score of 69, which falls within

---

[5]The ALJ also found that Plaintiff did not meet 12.05(A), (B), or (D). (R.pp. 32-33).

[6]The IQ measures in Listing 12.05 refer to scores on the third edition of the Wechsler Adult Intelligence Scale (WAIS–III), but the fourth edition of the test (WAIS–IV) does not give verbal and performance IQ scores. As a result, the performance IQ score has been replaced by the perceptual reasoning index for Listings purposes. See Priest v. Colvin, No. 1:15–1206–MGL–SVH, 2016 WL
(continued...)



the required 60 to 70 range. (R.p. 268). Notwithstanding this evidence, however, the ALJ only notes Dr. Spivey's conclusion that Plaintiff is functioning in the "borderline intellectual functioning range"; he never acknowledges or even discusses in either his Listing analysis or in his discussion of Plaintiff's RFC that Plaintiff had a perceptual reasoning (performance) score of 69. (R.pp. 32-33, 35).[7] Moreover, Dr. Spivey estimated that Plaintiff's full scale IQ score fell in the range of 67 to 75, such that it appears that Plaintiff's full scale IQ may fall within the range required to meet or equal Listing 12.05C. However, the ALJ did not discuss how this score might apply to Listing 12.05C, or whether he was discounting Dr. Spivey's finding insofar as this IQ score fell below 71.[8] The Appeals Council also noted Dr. Spivey's findings, but again no discussion of these IQ scores' applicability to the listing range of 12.05C is provided. (R.pp. 4, 6).

An ALJ may discredit IQ scores based on "other evidence contradicting them," and "has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." Hancock v. Astrue, 667 F.3d 470, 474 (4th Cir. 2012); see also Rowland v. Colvin, 2015 WL 2238958, at *7 (W.D.Va. May 12, 2015). However, in this case the

---

[6](...continued)
1104866 (D.S.C. Mar. 2, 2016), adopted by 2016 WL 1089416 (D.S.C. Mar. 21, 2016); Martin v. Comm'r, Soc. Sec. Admin., No. SAG–12–1130, 2013 WL 4512071, *2 (D.Md. Aug.22, 2013) ["Because the various tests have been modified since the Listings were created, the 'verbal comprehension index score' is the equivalent of 'verbal IQ', and the 'perceptional reasoning index score' is the equivalent of 'performance IQ.'"]. The Commissioner acknowledges that the perceptual reasoning score constitutes a performance score. Commissioner's Brief, ECF No. 19 at 1.

[7]Significantly, in discussing the findings of Dr. Spivey, the ALJ only noted that Plaintiff had a verbal comprehension score of 89 and a working memory score of 71, but did not reference or discuss Plaintiff's perceptual reasoning (performance) score. (R.p. 35).

[8]To the contrary, the ALJ states that in reaching his decision, he gave Dr. Spivey's assessment of Plaintiff's mental functioning "significant weight". (R.p. 37).

10



ALJ failed to articulate any reason for why he found Plaintiff's perceptual reasoning (performance) score of 69 to be invalid (assuming he did), nor did he discuss why Plaintiff's full scale IQ should not be deemed to have been below 71 (even though the range provided by Dr. Spivey fell below that number), such that it cannot be said that the ALJ made any determination supported by substantial evidence that Plaintiff failed to have IQ scores in the required range for Listing 12.05C. Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision].

The Commissioner argues that Dr. Spivey diagnosed Plaintiff with borderline intellectual functioning, which is mutually exclusive of mental retardation (intellectual disability)[9] such that Plaintiff cannot meet or equal Listing 12.05C. (R.pp. 268-269). However, as noted above, Dr. Spivey found Plaintiff's performance IQ score, and estimated Plaintiff's full scale IQ score, to be within the IQ ranges set forth in Listing 12.05C. Dr. Spivey also noted that Plaintiff's findings appeared to represent an accurate assessment of Plaintiff's intellectual, cognitive, and academic achievement functioning. (R.p. 267). However, in then determining that Plaintiff's mental impairment did not fall under Listing 12.05C, the ALJ failed to discuss or differentiate Plaintiff's IQ scores in reaching his conclusion. This Court cannot find the ALJ's decision to be supported by substantial evidence absent some explanation for how he came to his conclusions. Cotter v. Harris, 642 F.2d 700 (3rd Cir. 1981) [listing cases remanded because of ALJ's failure to provide proper explanation or reason for rejecting or not addressing relevant probative evidence].

---

[9]The Social Security Administration replaced the term "mental retardation" with "intellectual disability" in the listings through a final rule effective on September 3, 2013. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499 (Aug. 1, 2013) (codified at 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05).

11



The Commissioner also argues that the state agency psychologists, whose opinions the ALJ stated he gave significant weight (R.p. 37), agreed with a diagnosis of borderline intellectual functioning.[10] However, the state agency psychologists opinions were based on what appears to be an incomplete analysis of Dr. Spivey's opinion, as the state agency physicians only appear to have considered Listing 12.02 (organic mental disorders), not Listing 12.05, and also do not appear to have considered Dr. Spivey's findings that Plaintiff had a perceptual reasoning (performance) score of 69 or had a full scale score which could fall within the intellectually disabled range. (R.pp. 68-69, 80-81).

Finally, even if Plaintiff's IQ does fall between 60 and 70, he still has to have deficits in adaptive functioning to meet or equal Listing 12.05C. See Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."]. This requires a claimant to meet the introductory paragraph threshold by showing "significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 12.00(A). Plaintiff has the burden of proving an adaptive deficiency during the developmental years. See Hancock v. Astrue, 667 F.3d at 476 ; see also Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)[claimant has the burden of production and proof at Steps 1 to 4 of the sequential evaluation

---

[10]On December 12, 2012, Dr. Lisa Clausen, a state agency psychologist, opined that Plaintiff did not meet Listing 12.02, diagnosed Plaintiff with borderline intellectual functioning, and stated that there was no objective medical evidence to support mental retardation functioning because the November 2009 mental consultative examination (Dr. Spivey's examination) indicated that Plaintiff tested in the borderline intellectual functioning range. (R.p. 68-69). On February 26, 2013, Dr. Olin Hamrick, Jr., a state agency psychologist, made similar findings to those of Dr. Clausen. (R.pp. 80-81).



process]. Deficits in adaptive functioning "include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012)(citing Atkins v. Virginia, 536 U.S. 304, 308 n. 3 (2002)).[11]

       Here, however, the ALJ did not specifically discuss this criteria of Listing 12.05C; rather, he appears to have relied solely on the IQ prerequisites of this Listing. (R.pp. 32-33).[12] Thus, it is unclear whether the ALJ made any determination concerning whether Plaintiff had deficits in adaptive functioning initially manifested during the developmental period under the criteria of 12.05C. The ALJ did note that Plaintiff had earned a high school certificate of completion and that Plaintiff reported that he could read and write more than his name, had a drivers license, read comic

---

[11] The Social Security Administration (SSA) has expressly declined to mandate standards for determining deficits in adaptive functioning, recognizing that "the method of measuring the required deficits in adaptive functioning differ" among the four major organizations in the United States dealing with intellectual disabilities, and noting that the "SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002). Adaptive functioning is defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM)(published by the American Psychiatric Association) as follows:

> Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio cultural background, and community setting.

DSM-IV, p. 39. Areas to be considered when discussing adaptive functioning may include such areas as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Id.; see Wiley v. Epps, 625 F.3d 199, 216 (5th Cir. 2010).

[12] The only time the ALJ used the term "adaptive functioning" in his decision is in his discussion of Listing 12.05A, where he states that during Plaintiff's consultative evaluation by Dr. Spivey, Plaintiff "reported good adaptive functioning". (R.p. 32).

13



books, cared for his personal hygiene and self-care needs independently, did household chores, prepared simple meals, mowed the grass, and counted change. (R.pp. 32-33). However, the evidence also showed that Plaintiff continued to live with his parents; that his parents managed his finances and helped him with everyday tasks; he had only a brief history of part-time, unskilled work; he reportedly could only drive to close by places and got lost easily; and he had low academic achievement including that he was in special education classes and carried an assessment of educable mentally disabled. Dr. Spivey also agreed that Plaintiff might need help handling his finances. Additionally, the ALJ found that Plaintiff had at least moderate difficulties in his ability to maintain concentration, persistence, or pace. (R.p. 33). As such, absent some particular discussion and finding by the ALJ with respect to this criteria as applied to Listing 12.05C, the undersigned cannot determine whether substantial evidence would support a conclusion that Plaintiff had no deficit in adaptive functioning sufficient to meet this Listing.

While it is certainly possible that the ALJ on remand may still find that Plaintiff does not meet or equal Listing 12.05C, that is a finding that must be made by the ALJ after a full consideration and discussion of the evidence including, if required, the additional question of adaptive functioning, not by this Court in the first instance. See Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision]; Bray v. Commissioner of Social Security Admin., 554 F.3d 1219, 1225 (9th Cir. 2009)["Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."]; Nester, No. 2009 WL 349701 at * 2 [Noting that the Court "may not consider *post hoc* rationalizations but must evaluate only the



reasons and conclusions offered by the ALJ."].  Therefore, a remand of this case for a proper consideration of these matters is required.

## Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for revaluation and consideration of whether Plaintiff met or equaled Listing 12.05(C), and for such further administrative action as may be necessary and appropriate. See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

Charleston, South Carolina
May 3, 2017



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

16

